SCHOTT, Judge.
In one of these consolidated cases the husband filed suit against his wife seeking a judgment of divorce based upon allegations of acts of adultery between her and a named co-respondent on July 25, August 8 and August 11, 1970. In the other case, the wife sued for divorce based upon allegations that a judgment of separation had been signed on June 30, 1970, and they had lived separate and apart without reconciliation since that date. The husband’s suit was filed on September 21, 1970, while the wife’s suit was filed on July 1, 1971.
Upon a trial of the case, the trial judge dismissed the husband’s suit for divorce but granted a judgment to the wife on her petition. In his reasons for judgment the trial cburt said that the husband amply succeeded in proving that the occasions were present when his wife and the co-respondent had the opportunity of committing adultery. “But considering the evidence presented in this case, the Court cannot declare that the parties did commit adultery. Such a deduction would be far from in harmony with present day social standards.”
From this judgment the husband has appealed, specifying error in the trial court’s ruling that he had not maintained his burden of proof.
The evidence produced at the trial of the case by the husband consisted primarily of the testimony of two private detectives who had been employed by him to conduct a surveillance on his wife, corroborated by admissions of the wife and the co-respondent. On July 25, 1970, the detectives saw the wife and her co-respondent arrive at his apartment shortly after midnight where the couple remained at least until 3:40 AM, when the detectives discontinued their surveillance. The lights in the apartment were extinguished at 1:00 AM and remained so at the time of the detectives’ departure. The detectives saw the wife arrive at the co-respondent’s apartment at 3:30 PM on August 8 and remain until 5:05 PM, at which time she and the co-respondent departed together. At about midnight on that date they observed the wife and the co-respondent arrive at his apartment. The lights were extinguished at about 12:45 AM and until about 4:00 AM, when the detectives discontinued the surveillance, the couple remained in the darkened apartment. Finally, on August 11, 1970, they observed the co-respondent entering his apartment and at about 7:00 PM the wife admitting herself to the apartment with a key. At 10:00 PM the lights were extinguished and remained so until about midnight. At 12:30 AM the wife left the apartment and drove to her own home.
The co-respondent testified that he saw the wife every day since June, 1970. One of his automobiles was always available to the wife for her use so that she could have transportation for herself and her 13-year *58 old son. On occasion the boy came to his apartment and would bring a friend and while the couple would barbecue, the children swam in the pool. According to the co-respondent, they kept the child with them as much as possible. He did not deny that the wife was with him at the time of the first alleged adultery on July 25 nor was he certain that the child was with them at that time. He insisted that most of the time when the wife was in his apartment she was performing clerical work for which she was employed by him. He admitted that on occasions the wife remained overnight in his apartment but insisted that on those occasions the boy was also present and the wife and her son slept in the bedroom while he slept on the couch in the living room. On some of those occasions he said that he and the wife went out early in the evening leaving the boy in the apartment until their return. In answer to the question, “Was there a romantic attachment between you and Mrs. Udin in July and August, 1970?” the co-respondent answered “I would say yes.”
The wife testified that she was dating the co-respondent and also helping him with his office work as a means of support. She also admitted that she did on occasion stay overnight in his apartment but insisted that her son was always with her, she and her son sleeping in the bedroom and the co-respondent sleeping in the living room. “Lots of times” the boy would stay there while she and the co-respondent went out, and upon their return the boy would be sleeping. At other times the boy would fall asleep while they worked late in the apartment. On such occasions the wife remained with the boy rather than disturb him.
The question was put to the wife as to whether her son “is getting adjusted now to his mother and her boyfriend living together?” to' which she replied: “He is getting adjusted to his mother and this gentleman who his mother intends to marry.”
While on the witness stand both the wife and co-respondent denied that they had committed adultery on the dates alleged in the petition.
We have detailed the foregoing testimony because it is significant in a number of respects. For instance, the parties do not deny that they were together in the apartment at the times alleged in the petition and they readily concede that there were occasions when the two spent the night together in the co-respondent’s apartment. Also, it is apparent that this couple maintained a very close personal relationship during the period of time when the acts of adultery allegedly were committed, and in fact their relationship was so close that it was characterized by the co-respondent as “romantic” and was consistent with the wife’s statement of her own intention to be married to the co-respondent. Such circumstances certainly render applicable the following language in Morris v. Morris, La.App., 152 So.2d 291, cited with approval in Poole v. Poole, La.App., 189 So.2d 75:
“ . . . Both appellee and Harler conceded that on several occasions they were together in appellee’s apartment until the early morning hours. In fact our careful reading of the record in this case reveals that appellee and Harler admitted virtually all of appellant’s evidence denying only that they committed the act of intercourse itself. We believe the record herein fairly and reasonably shows, to that certainly required by law, that the opportunity and inclination to commit adultery has been established. . ."
In the case of Hayes v. Hayes, 225 La. 374, 73 So.2d 179, the Supreme Court provided us with a concise statement as to the heavy burden of proof imposed upon the husband in the instant case:
“ . . . While it is well settled that the unfaithfulness of a spouse may be established by indirect or circumstantial evidence forasmuch as, in the nature of *59 things, it can seldom be proved by direct or positive evidence, (citations omitted) . the facts and surrounding circumstances must be such as to lead fairly and necessarily to the conclusion that adultery has been committed as alleged in the petition . . . (citations omitted) . . In other words, the circumstantial proof in these cases must be so convincing as to exclude any other reasonable hypothesis but that of guilt.”
In weighing the evidence in this case to determine whether it meets the foregoing stringent test which was imposed upon the trial judge and is now imposed upon this Court, we are guided by the following language from McCartan v. Filkins, 134 La. 795, 64 So. 717:
“ . . .In actions for divorce, courts must take such evidence as the nature of the case permits, circumstantial, direct, or positive, and bring to bear upon it the experiences and observations of life, and thus weighing it with prudence and care give effect to its just preponderance.”
With this language as a proper guide for our evaluation of the evidence in this case we are convinced that there is no other reasonable hypothesis but that the wife did commit adultery on the dates alleged by her husband, the plaintiff.
The trial judge did not conclude that adultery had been committed because he said that such a deduction would not be “in harmony with present day social standards.” In this Court the wife argues that the trial judge’s reasoning in this respect is in harmony with the rationale of Dubois v. Falgout, La.App., 268 So.2d 70, in regard to the burden of proof in such cases as this one:
“As the trial court so aptly stated, in the light of the changing mores and attitudes toward social behavior, it is today no longer presumed, at least in a legal sense, that where there is an opportunity to commit adultery it will be committed or that when a man and a woman are alone together their only purpose in such a clandestine rendezvous will be for the gentle art of lovemaking. A suspicion of guilt cannot alone serve as a sufficient basis for the courts to stigmatize the defendant as guilty of the alleged act.”
In speculating on “present day social standards”' and “changing mores and attitudes toward social behavior” it may very well be a legitimate thesis that persons of the opposite sex today associate together with great ease and with little restraint as compared with couples in the past. Society today does not treat as unusual free and open, close relationships between men and women even when characterized by frequency and regularity. They visit in each other’s apartments, travel together, and occupy coeducational dormitories. Indeed, the concept of a chaperone is now regarded by many as outmoded if not antique. Perhaps it is true that courts should not readily infer that adultery is being committed in view of the fact that such behavior as we have described may be commonplace and even taken for granted today, but we may also speculate with as much persuasion that under our “present day social standards” and “changing mores and attitudes toward social behavior” couples who are inclined and who have the opportunity to commit adultery feel less compunction over the performance of the ultimate act of love since today’s permissive society does not seem to place so great a moral stigma on such conduct as it once did.
In deciding this case, we take note of Bosch v. Bosch, La.App., 143 So.2d 284, in which this Court applied the same basic rules which are alluded to' above but arrived at an opposite result. We do not find any conflict between our opinion in the instant case and the cited case because the facts and circumstances of the cited case were not of such weight as to exclude any other reasonable hypothesis but that of guilt. In the instant case we hold the evidence adduced at the trial is sufficient to prove the acts of adultery alleged, and to warrant a reversal of the trial judge’s action in these consolidated cases.
*60 Accordingly, it is now ordered that there be judgment of divorce a vinculo matri-monii in favor of the husband, Stanley Udin, and against his wife, Marian Levin Udin, forever dissolving the bonds of matrimony which heretofore existed between them. In the companion case, there will be judgment in favor of Stanley Udin, dismissing the petition for divorce filed by his wife. The judgment insofar as it awarded care, custody and control of the minor, Kenneth Udin, to Marian Levin Udin and condemned Stanley Udin to pay child support in the sum of $40.00 per week will be left undisturbed. All costs are to be borne by the wife, Marian Levin Udin.
Reversed and rendered.